## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2017, 9:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew J. Sickmann
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Involuntary Termination of the Parent-Child Relationship of C.H., Minor Child, and A.H.,

*Appellant-Defendant,*

v.

Indiana Department of Child Services,

*Appellee-Plaintiff*

December 29, 2017

Court of Appeals Case No.
89A01-1708-JT-1781

Appeal from the Wayne Superior Court

The Honorable Darrin M. Dolehanty, Judge

Trial Court Cause No.
89D03-1703-JT-7

**Altice, Judge.**

## Case Summary

[1] A.H. (Father) appeals following the termination of his parental rights to his daughter, C.H. (Child). On appeal, Father argues that the trial court's judgment is not supported by its findings.

[2] We affirm.

### Facts & Procedural History

[3] Child was born to Y.H. (Mother) and Father in April 2009. Mother died of a drug overdose in November 2015, and Father was incarcerated and therefore unavailable to care for Child. As a result, the Department of Child Services (DCS) placed Child in a relative foster placement with her uncle (Uncle). Child was adjudicated a Child in Need of Services (CHINS) on November 18, 2015.

[4] At the beginning of the CHINS case, DCS could provide only minimal services to Father due to his incarceration. Nevertheless, Father participated in the Fatherhood Engagement Program (FEP) during his incarceration, and he also voluntarily completed a substance abuse program offered at the jail. Father also had regular contact with Child during his incarceration—Uncle brought Child to the jail to visit a few times and Father called about twice per week.

[5] Upon his release from jail in June 2016, Father was referred for additional services, including a parenting assessment, case management, a substance abuse assessment, and individual counseling. Father, who has struggled with addiction for many years, requested substance abuse services and individual counseling to help him process his grief over Mother's death. Father obtained

employment in August 2016, working first shift as well as significant overtime. Father's work schedule prevented him from participating in most services until February 2017, when he took it upon himself to switch to second shift. Thereafter, Father became more engaged in services.

[6] DCS assisted Father in obtaining housing and paid his first month's rent and deposit in October 2016. Before DCS would provide this assistance, Father was required to provide paystubs evidencing his ability to pay his rent going forward. Nevertheless, Father got behind in rent almost immediately. Father could not explain why he was unable to pay his rent, but he admitted that he spent $175 on crack cocaine on one occasion. Father also indicated that he had bought cigarettes and other miscellaneous items, as well as gifts for Child. Additionally, when Family Case Manager (FCM) Scarlett Hughes visited Father's apartment, she was troubled by its condition. There was dog urine on the floors, a can of cigarette butts and cigarette ashes all over the floor, the sink was full of dirty dishes, and dirty laundry was piling up. Father was also allowing another person to live with him in violation of his lease. Father was evicted from his apartment, but refused to vacate and continued to reside there at the time of the termination hearing. A new eviction complaint was filed against him the day before the termination hearing.

[7] Father admitted to being an addict for twenty years and that his unresolved grief over Mother's death had contributed to his repeated relapses. After his release from jail in June 2016, Father maintained sobriety for a few months. On October 2016, one of Father's visits with Child was cancelled due to

Father's intoxication. Additionally, on one occasion in February 2017, FCM Hughes went to Father's apartment and could not get anyone to answer the door, although she could hear people inside. After about thirty minutes of knocking, FCM Hughes called the police and asked for a wellness check. When officers arrived and got Father to come outside, he was stumbling, his eyes were red, and he was very agitated. When Father later discussed the incident with FCM Hughes, he blamed his intoxication on his grief and inability to cope with Mother's death.

[8] After switching to second shift in February 2017, Father began participating in an intensive outpatient drug treatment program. During the first phase of the program, Father was very engaged and appeared to be responding positively. Father abstained from using drugs from February until May 2017. Despite his continued participation in drug treatment, however, Father relapsed in May and continued to use cocaine and opiates up until a week before the termination hearing.

[9] Additionally, on June 21, 2017, Father was fired from his job for missing work. Father claimed he was fired because he missed one day due to illness, but he did not seek medical attention. Father declined his FEP case manager's offers to help him find another job, claiming at first that he was too ill and later that he was too depressed.

[10] DCS filed a petition to terminate Father's parental rights on March 2, 2017. A factfinding hearing was held on July 13, 2017, and on July 19, 2017, the trial

court issued its order terminating the parent-child relationship between Father and Child.[1]  Father now appeals.  Additional facts will be provided as necessary.

## Discussion & Decision

[11]  When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*  Instead, we consider only the evidence and reasonable inferences most favorable to the judgment.  *Id.*  In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*  Thus, if the evidence and inferences support the decision, we must affirm.  *Id.*

[12]  The trial court entered findings in its order terminating Father's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review.  *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).  First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment.  *Id.*  "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."  *Quillen*

---

[1] The trial court's order was very detailed and thoughtful, and it has been immensely helpful to our consideration of the issues before us.

*v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[13] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[14] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:

>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[15] Father first challenges the trial court's finding pursuant to subsection (b)(2)(B)(i) that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside his care will not be remedied. In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* The trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v.*

*Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[16]    Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Although a trial court is required to give due regard to changed conditions, this does not preclude a finding that a parent's past behavior is the best predictor of his or her future behavior. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014).

[17]    The trial court entered the following relevant findings on this issue:

> There is clear and convincing evidence to conclude that the reasons why Child was removed from home originally, and the barriers that arose subsequent to that removal, will not be remedied. Child was taken into protective custody in November, 2015, because her mother had died, and her father was incarcerated. Even while Father was incarcerated, his substance abuse problems were identified, and services were initiated to address that barrier to reunification. Of his own, Father enrolled in and completed a jailhouse substance abuse program. Once Father was released from jail, the DCS referred him to a much more intensive substance abuse treatment program. Father attended the treatment sessions, and moved into the "relapse prevention" stage. Despite these efforts, Father has continued to abuse illegal drugs. In so concluding, the Court does not surrender Father's treatment as a hopeless cause, or eternize that he will never gain some level of control over his addictions. Nonetheless, there exists an identifiable and reasonable probability that this major obstruction to reunification will not be overcome.

The parties stipulated that Father's absence of transportation, housing, and income were originally identified as barriers to reunification. Father remains without transportation, however, there was really no evidence to show that the absence of transportation prevented Father from participating in services, attending hearings, working, or exercising parenting time. Father was able to obtain housing only through financial intervention of the DCS, and even then, he was quickly behind on rent, was "evicted" (although not removed) from his residence, and is now facing another eviction lawsuit. Father was employed for a stretch of several months, but has recently lost his job, and seems to have given up on finding another. In short, Father is back at square one regarding these three barriers to reunification, and the evidence supports a reasonable probability that he will not be able to address these issues.

*Termination Order* at 5, ¶ 3.[2] Father does not argue that any of the trial court's factual findings are unsupported by the evidence. Instead, he directs our attention to other findings concerning Father's participation and progress in services and his bond with Child in support of an argument that the trial court's findings do not support its judgment. In other words, Father invites us to reweigh the evidence and substitute our judgment for that of the trial court, which we will not do on appeal. The trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's continued placement outside Father's care will not be remedied is well-supported by the evidence and findings.

---

[2] Father has not included the trial court's order in his Appellant's Appendix, but he did electronically file the order as an attachment to his brief. We therefore cite the order separately.

[18] Father also challenges the trial court's finding that termination of his parental rights is in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[19] The trial court had the following to say concerning whether termination was in Child's best interests:

> There is clear and convincing evidence to conclude that terminating the parent-child relationship is in Child's best interest. [Child] is eight (8) years old, and has lived outside of Father's care for the most recent twenty percent (20%) of her life. As Father was already incarcerated at the time [Child] was taken into protective custody, that figure is at the low end. (No evidence was presented regarding the duration of Father's

incarceration prior to [Child] being taken into protective custody.) Father is currently using illegal drugs, appears subject to eviction from his residence, and is again unemployed. This reality means that [Child] is not likely to be returned to Father's care in the near future.

At the same time, [Child] is thriving in her current placement. She is engaged in services; is bright and cheerful, and is well cared for and safe in her uncle's home. The child loves her father, and her father loves her in return. Nonetheless, [Child's] bests interests are met through termination of parental rights.

*Termination Order* at 5-6, ¶ 4. The trial court's assessment of the situation is persuasive, and we note further that FCM Hughes and the CASA both recommended termination of Father's parental rights and adoption by Uncle. Child needs permanency and stability, and she has found both in Uncle's home. Although we do not doubt that Father loves Child very much and wishes to be with her, he has demonstrated time and again that he is unable to care for her. Indeed, Father admitted to the CASA that he was not even able to take care of himself. The trial court's finding that termination was in Child's best interest was supported by the evidence and findings, as was its judgment terminating Father's parental rights.

[20] Judgment affirmed.

[21] May, J. and Vaidik, C.J., concur.